## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

Erchonia Medical, Inc., et al.,

      Plaintiffs

    v.

Miki Smith, et al.,

      Defendants

Erchonia Medical, Inc., et al.,

      Plaintiffs

    v.

Miki Smith, et al.,

      Defendants

Robert E. Moroney, LLC, et al.,

      Plaintiff

    v.

Erchonia Medical, Inc., et al.,

      Defendants



FILED    LODGED
RECEIVED    COPY

MAR 1 3 2006

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ E. DEPUTY

Case No.: CIV 02-2036-PHX-MHM

Consolidated with
CIV 02-2048-PHX-MHM
and
CIV 02-2353-PHX-MHM

## SPECIAL MASTER'S FINAL REPORT AND RECOMMENDATION
## ON
## CLAIM CONSTRUCTION

# TABLE OF CONTENTS

I. Introduction ............................................................................................................................. 2

    A.   Background ..................................................................................................................... 2

    B.   Referral to the Special Master .................................................................................... 2

II. Claim Construction Principles ................................................................................................ 4

    A.   Background ..................................................................................................................... 4

    B.   Overview ........................................................................................................................ 5

        1.   Asserted Patent Claims ........................................................................................ 6

           a) Actual Words of the Claims ........................................................................... 6

           b) Procedure ......................................................................................................... 8

           c) Ordinary and Customary Meaning to One of Ordinary Skill in the Art ............................. 10

           d) Sources of Ordinary and Customary Meaning ........................................... 11

           e) Claim Terms Construed in Context With Other Words in the Claim .................................. 16

           f) Other Patent Claims – Consistency and Differentiation ............................ 17

           g) Prior Art Cited During Prosecution or Incorporated by Reference May Provide a Guide to Proper Construction ................................ 18

        2.   Construction in Light of the Specification ...................................................... 19

        3.   Prosecution History ............................................................................................ 23

        4.   Extrinsic Evidence .............................................................................................. 25

        5.   Means-Plus-Function Limitations .................................................................... 26

           a) Overview ......................................................................................................... 26

           b) Statutory Equivalents Distinguished From Equivalents Under the Doctrine of Equivalents ............................ 34

        6.   Construction for Infringement v. Construction for Validity ........................ 37

        7.   Claim Construction in This Report and Recommendation ......................... 37

III. U.S. Patent No. 6,013,096 – the '096 Patent ....................................................................... 38

    A.   Description .................................................................................................................. 38

    B.   Prosecution History ................................................................................................... 45

        1.   Original Application ............................................................................................ 45

        2.   Office Action – January 15, 1999 ..................................................................... 49

        3.   Applicant's Response – June 21, 1999 ............................................................. 54

    C.   The Asserted Claims ................................................................................................. 58

IV. Construction of the '096 Patent Claims ............................................................................... 60

A.   "comprising" .............................................................................................................. 60

   1.   Term in Context .................................................................................................. 60

   2.   The Parties' Proposed Constructions.............................................................. 61

   3.   Recommended Construction............................................................................. 61

B.   "a wand in the form of a substantially elongated hollow tube defining an interior cavity and capable of being retained in a hand of a user and freely moved relative to the surface of the skin of a patient to receive the medical therapy" ................................................................................................................... 62

   1.   Terms in Context ................................................................................................ 62

   2.   The Parties' Proposed Constructions.............................................................. 62

C.   "means mounted in said interior cavity of said wand for generating a beam of laser light in the red color spectrum"........................................................................ 63

   1.   Terms in Context ................................................................................................ 63

   2.   The Parties' Proposed Constructions.............................................................. 63

D.   "an optical arrangement * * *".................................................................................... 65

   1.   Terms in Context ................................................................................................ 65

   2.   The Parties' Proposed Constructions.............................................................. 66

   3.   Discussion ............................................................................................................ 72

      a) Claim Language................................................................................................ 72

      b) Connotation of "optical arrangement".......................................................... 73

         (1)   Dictionaries........................................................................................ 73
         (2)   "optical arrangement" vs. "optical system" .................................... 74
         (3)   Use of "optical arrangement" in the Claims and Specification.............. 76
         (4)   Prosecution History........................................................................... 83
         (5)   Is "optical arrangement" a "coined" term?..................................... 87
         (6)   Sufficient Structure for Performing the Function ...................... 109
         (7)   Claim Differentiation ....................................................................... 114
      c) Expert Declaration ......................................................................................... 115

   4.   Parties' Comments on Draft Report and Recommendation ................................. 116

   5.   Recommendation ................................................................................................ 123

E.   "means disposed in said interior chamber of said housing for supplying electrical power to said laser beam generating means" ............................................ 123

   1.   Terms in Context ................................................................................................ 123

   2.   The Parties' Proposed Constructions.............................................................. 124

   3.   Discussion ............................................................................................................ 125

   4.   Recommendation ................................................................................................ 130

F.   "means for electrically interconnecting said laser beam generating means and said electrical power supplying means such that said wand is movable relative to said housing" .................................................................................................. 130

   1.   Terms in Context .......................................................................................................... 130

   2.   The Parties' Proposed Constructions ................................................................... 131

   3.   Discussion ...................................................................................................................... 132

   4.   Recommendation .......................................................................................................... 134

G.   "an electrical cord having opposite ends, one of said opposite ends being attached to said wand and making electrical connection with said laser, the other of said opposite ends being attached to said housing and making electrical connection with said battery such that said wand is movably relative to said housing" .................................................................................................. 135

   1.   Terms in Context .......................................................................................................... 135

   2.   The Parties' Proposed Constructions ................................................................... 136

   3.   Discussion ...................................................................................................................... 136

   4.   Recommendation .......................................................................................................... 137

H.   "means on said housing for controlling a period of time said beam of laser light is generated" ............................................................................................................ 137

   1.   Terms in Context .......................................................................................................... 137

   2.   The Parties' Proposed Constructions ................................................................... 138

   3.   Discussion ...................................................................................................................... 139

   4.   Recommendation .......................................................................................................... 141

I.   "means for controlling a period of time said beam of laser light is generated, said controlling means including" ........................................................................... 142

   1.   Terms in Context .......................................................................................................... 142

   2.   The Parties' Proposed Constructions ................................................................... 142

   3.   Discussion ...................................................................................................................... 143

   4.   Recommendation .......................................................................................................... 144

J.   "means electrically activatable for generating a sound audible to the user" ............................ 144

   1.   Terms in Context .......................................................................................................... 144

   2.   The Parties' Proposed Constructions ................................................................... 145

   3.   Discussion ...................................................................................................................... 145

   4.   Recommendation .......................................................................................................... 146

K.   "means electrically connected to said timing circuit and said sound generating means for electrically charging in response to said beam of laser light being generated and for electrically discharging and thereby electrically activating

said sound generating means in response to termination of generation of
said beam of laser light" .................................................................................................... 147

    1.   Terms in Context ..................................................................................................... 147

    2.   The Parties' Proposed Constructions...................................................................... 147

    3.   Discussion ................................................................................................................ 148

    4.   Recommendation ..................................................................................................... 149

  L.   Dependent Claims ........................................................................................................ 149

V. Final Report and Recommendation ................................................................................... 151

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Erchonia Medical, Inc., *et al.*,<br><br>　　　　Plaintiffs<br><br>　　v.<br><br>Miki Smith, *et al.*,<br><br>　　　　Defendants | § § § § § § § § § § | Case No.: CIV 02-2036-PHX-MHM<br><br>**Consolidated with**<br>**CIV 02-2048-PHX-MHM**<br>**and**<br>**CIV 02-2353-PHX-MHM** |
| Erchonia Medical, Inc., *et al.*,<br><br>　　　　Plaintiffs<br><br>　　v.<br><br>Miki Smith, *et al.*,<br><br>　　　　Defendants | § § § § § § § § § § | |
| Robert E. Moroney, LLC, *et al.*,<br><br>　　　　Plaintiffs<br><br>　　v.<br><br>Erchonia Medical, Inc., *et al.*,<br><br>　　　　Defendants | § § § § § § § § § § | |

## SPECIAL MASTER'S FINAL REPORT AND RECOMMENDATION
## ON
## CLAIM CONSTRUCTION

# I.
# Introduction

## A.    Background

In this consolidated action, Erchonia Medical Inc. ("Erchonia") and Kevin Tucek have charged Robert E. Moroney, LLC ("REM"), Robert E. Moroney, Miki Smith, George Gonzalez and Lorena Guzman, KMS Marketing Inc. and A Major Difference, Inc. (collectively the "REM Parties") with infringement of claims 1-3, 5-12 and 14-16 of U.S. Patent No. 6,013,096, entitled "Hand-Held Laser Light Generator Device." Erchonia was apparently formed in 2001 when two predecessor companies, Tuco Innovations, Inc. and Majes-Tec Innovations, Inc. merged. Erchonia Medical, Inc.'s and Kevin Tucek's Brief Re Patent Claim Construction [Docket No. 239] ("Erchonia's Brief") at 3. Tuco, according to Erchonia, was a manufacturer of therapeutic devices that were sold primarily to the chiropractic market. *Id.* Those devices were, apparently, originally marketed and sold through Majes-Tec. *Id.* Tucek, according to Erchonia, was a principal in Tuco and is now a principal in Erchonia. *Id.*

## B.    Referral to the Special Master

This Court's Order of June 6, 2005 [Docket No. 259], appointed the undersigned as a special master in this cause. The Order referred "all pretrial matters involving interpretation of asserted claims of U.S. Patent No. 6,013,096" to the master for a report and recommendation. Accordingly, the parties have provided briefs and submissions to the master addressing their proposed forms of construction. Additionally, an oral *Markman*[*] hearing was held via a telephone conference on August 26, 2005. A transcript of that hearing has been prepared and filed with the Court.

Rule 53, FED. R. CIV. P., as amended in 2003, does not expressly address draft reports and recommendations, as did prior Rule 53(e)(5)("(5) *Draft Report.* Before filing the master's report a master may submit a draft thereof to counsel for all parties for the purpose of receiving their suggestions."). Nevertheless, Rule 53(c), as amended, provides generally that "[u]nless the appointing order expressly directs otherwise, a master has authority to regulate all proceedings and take all appropriate measures to perform fairly and efficiently the assigned duties."

---

[*] *Markman v. Westview Instrs., Inc.*, 52 F.3d 967 (Fed. Cir. 1995)(*en banc*), *aff'd.*, 517 U.S. 370 (1996).

2

After reviewing the briefs and submissions offered by the parties, the master initially concluded that the parties' comments and suggestions would be helpful before issuing a final report and recommendation on claim construction. In particular, as discussed further below, a demonstrative exhibit that Erchonia submitted for the *Markman* teleconference hearing, intended to show the terms and limitations remaining in dispute and to highlight the differences between the parties' respective constructions, does not appear to account for Exhibit 1 to the *Markman* Reply Brief of Defendants Robert E. Moroney, LLC, Robert Moroney and A Major Difference, Inc. [Docket No. 248] ("REM Parties' Reply"), that indicates that many terms were no longer in dispute. As a result, it was not entirely clear what terms remained in dispute. Additionally, the REM Parties raised an issue during the *Markman* teleconference to the effect that "optical arrangement" was a term "coined" by the '096 patentee. As discussed below, available resources indicate that is not the case, but the parties had not directly addressed that issue in their briefs.

Therefore, a draft report and recommendation dated January 10, 2006 [Docket No. 320] was served on the parties for their comments. The parties were given thirty (30) days from the date the draft report and recommendation was served on the parties in which to file such comments. That time period was subject to enlargement upon the motion of any party for good cause shown. No party requested an enlargement of time. Parties wishing to comment on all or any part of the draft report and recommendation were directed to serve those comments on the master and all opposing parties, and file the same with the Court. Any party desiring to respond to comments by another party was directed to serve such response on the master and all opposing parties, and file the same with the Court, within ten (10) days of the date those comments were served.

In commenting on the draft, the parties were directed that they need not, and should not, repeat arguments that had been raised in their briefs and which had been addressed in the draft report and recommendation. The parties were directed to limit their comments to those instances in which the parties believed that the draft report and recommendation contained clear errors of law or fact, or otherwise required clarification.

Erchonia, by letter dated February 8, 2006 [Not Docketed], advised that it did not have any comments on the draft report and recommendation that it wished to direct to the master. The REM Parties, in a "Response to Special Master's Draft Report and Recommendation on Claim Construc-

3

tion by Robert E. Moroney, LLC, Robert E. Moroney and Major Difference, Inc." ("REM Parties'
Draft RR Response") [Docket No. 322], dated February 9, 2006, requested clarification of the mean-
ing of "optical arrangement." Erchonia filed a "Reply to Response to Special Master's Draft Report
and Recommendation on Claim Construction" ("Erchonia's Draft RR Reply") [Docket No. 323],
dated February 21, 2006, generally urging that "optical arrangement" did not require further defini-
tion, but if clarification was required, the Court should not adopt the "clarification" that the REM
parties seek. The parties' respective arguments have been considered, and are addressed below.

Lastly, prior to the Order appointing the undersigned as special master, REM filed a Motion
to Strike the Expert Witness Disclosure of John E. Greivenkamp, Jr. [Docket No. 247] which has
been offered by Erchonia. That motion was denied in the Court's Order of December 16, 2005. As
discussed further below, although that expert witness disclosure has been considered, it has not been
relied upon in rendering either the draft or this final report and recommendation.

## II.
## Claim Construction Principles

### A.    Background

The parties' submissions were filed prior to the Federal Circuit's *en banc* opinion in *Phillips v.
AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)(*en banc*). The parties, however, addressed the impact of
*Phillips* during the teleconference hearing on August 26, 2005. The Federal Circuit has also ad-
dressed claim construction in several post-*Phillips* decisions including *Pause Technology LLC v. TiVo
Inc.*, 401 F.3d 1290 (Fed. Cir. 2005); *Research Plastics, Inc. v. Federal Packaging Corp.*, 421 F.3d 1290
(Fed. Cir. 2005); *Terlep v. Brinkmann Corp.*, 418 F.3d 1379 (Fed. Cir. 2005); *CollegeNet, Inc. v. Apply-
Yourself, Inc.*, 418 F.3d 1225 (Fed. Cir. 2005); *AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d
1374 (Fed. Cir. 2005); *Free Motion Fitness, Inc. v. Cybex International, Inc.*, 423 F.3d 1343 (Fed. Cir.
2005); *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1286 (Fed. Cir. 2005); *Network Commerce,
Inc. v. Microsoft Corp.*, 422 F.3d 1353 (Fed. Cir. 2005), and *Nystrom v. TREX (Nystrom II)*, 424 F.3d
1136 (Fed. Cir. 2005).

4

## B.     Overview

A patent is a fully integrated written instrument.  *Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996).  A patent, by statute, must provide a written description of the invention, a disclosure that would enable one of ordinary skill in the art to make and use the invention, and a disclosure of the best mode known to the inventor for practicing the invention.  35 U.S.C. § 112(1).[1]  A patent must also contain claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(2).[2]  The claims of a patent provide the measure of a patentee's right to exclude others from practicing the claimed invention.  35 U.S.C. § 154.  The Federal Circuit in *Phillips* similarly observed that "[t]hose two paragraphs of section 112 frame the issue of claim interpretation for us. The second paragraph requires us to look to the language of the claims to determine what 'the applicant regards as his invention.' On the other hand, the first paragraph requires that the specification describe the invention set forth in the claims." 415 F.3d at 1312.

Patent claims, as properly interpreted in light of the specification and prosecution history, provide a public notice function.  *Merrill v. Yeomans*, 94 U.S. 568, 573-74 (1877) ("It seems to us that nothing can be more just and fair, both to the patentee and to the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent.").  *See also Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002)("Fairness and the public notice function of the patent law require courts to afford patentees the full breadth of clear claim language, and bind them to it as well.").  Parties frequently, though, disagree over how specific terms or phrases in patent claims should be interpreted or construed.

---

[1]  35 U.S.C. § 112(1) provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

[2]  35 U.S.C. § 112(2) provides:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Accordingly, the court is obliged to resolve such disputes and to "construe" the claims to determine their true meaning and scope. *Markman,* 52 F.3d at 976. That is typically referred to as "claim construction," and is a matter of law for the court on the rationale that "it is only fair (and statutorily required) that competitors be able to ascertain to a reasonable degree the scope of the patentee's right to exclude" and that "competitors should be able to rest assured, if infringement litigation occurs, that a judge, trained in the law, will similarly analyze the text of the patent and its associated public record and apply the established rules of construction, and in that way arrive at the true and consistent scope of the patent owner's rights to be given legal effect." *Id.* at 978-79.

"The role [of claim construction] is neither to limit nor to broaden the claims, but to define, as a matter of law, the invention that has been patented." *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed. Cir. 2001). In construing the claims, courts are not permitted to re-write the claims. *See Chef Am., Inc. v. Lamb-Weston, Inc.,* 358 F.3d 1371, 1373 (Fed. Cir. 2004)(in construing the term "heating the resulting batter-coated dough to a temperature in the range of about 400° F. to 850° F," the court explained "courts may not redraft claims, whether to make them operable or to sustain their validity. * * * Thus, in accord with our settled practice we construe the claim as written, not as the patentees wish they had written it. As written, the claim unambiguously requires that the dough be heated to a temperature range of 400° F. to 850° F" – even if "the resultant product of such heating will be something that, in the words of one of the attorneys in this case, resembles a charcoal briquet."); *Becton Dickinson & Co. v. C.R. Bard Inc.,* 922 F.2d 792, 799 n.6 (Fed. Cir. 1990)("Nothing in any precedent permits judicial redrafting of claims."). Rather, " '[c]laim construction' is the judicial statement of what is and is not covered by the technical terms and other words of the claims." *Netword,* 242 F.3d at 1352.

## 1.   Asserted Patent Claims

### a)   Actual Words of the Claims

The Federal Circuit has instructed the courts that "[t]he actual words of the claim are the controlling focus." *Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1344 (Fed. Cir. 1998). The Federal Circuit in *Phillips* reiterated that principle:

> It is a "bedrock principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Innova,* 381 F.3d

at 1115; *see also Vitronics*, 90 F.3d at 1582 ("we look to the words of the claims themselves * * * to define the scope of the patented invention"); *Markman*, 52 F.3d at 980 ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). That principle has been recognized since at least 1836, when Congress first required that the specification include a portion in which the inventor "shall particularly specify and point out the part, improvement, or combination, which he claims as his own invention or discovery." Act of July 4, 1836, ch. 357, § 6, 5 Stat. 117, 119. In the following years, the Supreme Court made clear that the claims are "of primary importance, in the effort to ascertain precisely what it is that is patented." *Merrill v. Yeomans*, 94 U.S. 568, 570 (1876). Because the patentee is required to "define precisely what his invention is," the Court explained, it is "unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." *White v. Dunbar*, 119 U.S. 47, 52 (1886); *see also Cont'l Paper Bag Co. v. E. Paper Bag Co.*, 210 U.S. 405, 419 (1908) ("the claims measure the invention"); *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895) ("if we once begin to include elements not mentioned in the claim, in order to limit such claim * * * , we should never know where to stop"); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961) ("the claims made in the patent are the sole measure of the grant").

415 F.3d at 1312.

The actual words of the claims, however, are viewed in conjunction with the patent specification of which they are a part and the public record of the exchanges between patent applicants and the U.S. Patent and Trademark Office ("PTO"), namely, the prosecution history: "It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history * * *. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001)(alteration in original)(quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). As noted above, in *Phillips*, the Federal Circuit explained that "[i]mportantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." 415 F.3d at 1313. The Federal Circuit further explained that:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to

7

> have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention – the inventor's lexicography – must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

*Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)). The court also cited *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005)(The "intrinsic record 'usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention.' "); and *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2004)(proper definition is the "definition that one of ordinary skill in the art could ascertain from the intrinsic evidence in the record"), *inter alia*, with approval.

### b) Procedure

Procedurally, the Federal Circuit has instructed trial courts in the past to look first to the claim language itself to define the scope of the patented invention, and, as a starting point, to give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art. "The claim construction analysis begins with the words of the claim." *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004). *See also Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000). *See also Ferguson Beauregard/Logic Controls v. Mega Sys., LLC*, 350 F.3d 1327, 1347 (Fed. Cir. 2003)( Rader J., concurring)("This court often uses the term 'ordinary and customary meaning.' While the 'ordinary' meaning, often represented by the first listing in a reputable dictionary, can occasionally have relevance to construing terms in a patent claim, this court's case law requires primary reliance on the 'customary' meaning. The 'customary meaning' of a term in a patent claim links the inquiry to the understanding of one of ordinary skill in the art at the time of invention.").

In *Phillips*, the Federal Circuit likewise noted that "[t]he inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation," and "[t]hat starting point is based on the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and

intended to be read by others of skill in the pertinent art." 415 F.3d at 1313. Nevertheless, the court in *Phillips* also noted that a court is not required to analyze sources "in any specific sequence." "For example, a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term." *Id.* at 1324. In particular, the court explained that "[t]he sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id.* (citing *Vitronics*, 90 F.3d at 1582).

In *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002), the court cautioned that "[c]onsulting the written description and prosecution history as a threshold step in the claim construction process, before any effort is made to discern the ordinary and customary meanings attributed to the words themselves, invites a violation of our precedent counseling against importing limitations into the claims." Thus, *Texas Digital* was sometimes characterized as a "dictionaries first" analysis; an analysis that was criticized by virtually all of the some 28 organizations that filed amicus briefs in *Phillips*.[3] To the extent that analysis places the specification in a secondary role to dictionary and like definitions, the *en banc* court in *Phillips* plainly rejected that analysis. ("Assigning such a limited role to the specification, and in particular requiring that any definition of claim language in the specification be express, is inconsistent with our rulings that the specification is 'the single best guide to the meaning of a disputed term,' and that the specification 'acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.' "). *Phillips*, 415 F.3d at 1320-21 (quoting *Vitronics*, 90 F.3d at 1582.).

---

[3] *See, e.g.*, Brief for the Government as *Amicus Curiae* at 9 (urging that the court return to the analysis of *Vitronics v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)("The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.")(citations omitted); Brief of *Amicus Curiae* Intellectual Property Owners Association at 5 ("IPO submits that precedent and policy both suggest that claims should be construed primarily in light of the specification and prosecution history. As the Supreme Court and this Court have found, a patent's claims are part of the patent specification and are the product of prosecution and should be read in that context. In addition, as the primary components of the public record, the specification and prosecution history also best serve the function of putting the public on notice of the patentee's protected rights. Primary reliance on this public record also serves to minimize disputes over which other resources, if any, those of skill in the art would consider in determining claim scope.").

Nevertheless, the Federal Circuit in *Phillips* further commented: "We also acknowledge that the purpose underlying the *Texas Digital* line of cases – to avoid the danger of reading limitations from the specification into the claim – is sound. Moreover, we recognize that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice. * * * However, the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Phillips*, 415 F.3d at 1323.

### c) Ordinary and Customary Meaning to One of Ordinary Skill in the Art

The Federal Circuit has repeatedly emphasized that claims are construed through the "viewing glass" of a person skilled in the art. *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1331 (Fed. Cir. 2001)("In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.' 35 U.S.C. § 112, ¶ 2.")(alterations in original). *See also Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1554 (Fed. Cir. 1997). "We have made clear, moreover, that the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application."[4] *Phillips*, 415 F.3d at 1313. Accordingly, a term used in a patent is interpreted as having the meaning a person of ordinary skill in the field of the invention would give such term in

---

[4] The Federal Circuit thus resolved an open question. The court has not always been consistent in stating whether the controlling date for claim construction purposes is the date of filing or the date of issuance. *See Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1378 n.2 (Fed. Cir. 2002)("Our decisions have not always been consistent as to whether the pertinent date is the filing date of the application or the issue date of the patent."). Most frequently, though, the Federal Circuit seems to have referred to the "time of invention" as the temporal context for construing claim language. *See Metabolite Labs, Inc. v. Lab Corp. of Am.*, 370 F.3d 1354, 1360 (Fed. Cir. 2004); *SmithKline Beecham Corp. v. Apotex Corp*, 365 F.3d 1306, 1313 (Fed. Cir. 2004); *Alloc Inc. v. United States Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003) ("[T]o determine claim meaning, a court immerses itself in the specification, the prior art, and other evidence, such as the understanding of skilled artisans at the time of invention, to discern the context and normal usage of the words in the patent claim.")(emphasis added); *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1555 (Fed. Cir. 1997)("[T]he testimony of one skilled in the art about the meaning of claims terms at the time of invention will almost always qualify as relevant evidence.")(emphasis added). Most recently, the Federal Circuit has explained that the relevant time for construing the meaning of claim terms is the patent's effective filing date. *See PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005)("A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date.").

869435.1

the relevant art at the time of invention, unless the specification or prosecution history indicates that the inventor adopted or advocated a different meaning for such term. *See Metabolite Labs., Inc. v. Lab. Corp. of Am.*, 370 F.3d 1354, 1360 (Fed. Cir. 2004))("The touchstone for discerning the usage of claim language is the understanding of those terms among artisans of ordinary skill in the relevant art at the time of invention. * * * Thus, this court sets the meaning of claim terms by ascertaining their technological and temporal context.")(citations omitted); *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1338 (Fed. Cir. 2005)("Claim interpretation requires the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of invention. * * * This task requires the court to place the claim language in its proper technological and temporal context. The best tools for this enterprise are the various forms of intrinsic evidence and, when appropriate, extrinsic evidence."). *See also Nat'l Recovery Techs., Inc. v. Magnetic Separation*, 166 F.3d 1190, 1195 (Fed. Cir. 1999). "Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998).

Accordingly, an initial question is whether a term has an ordinary and customary meaning in the art, *Vitronics*, 90 F.3d at 1582, *i.e.*, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313.

### d) Sources of Ordinary and Customary Meaning

One issue that arises is what sources a court may justifiably rely on in ascertaining the understanding of one of ordinary skill in the art. The Federal Circuit has explained that "[t]he ordinary and customary meaning of a claim term may be determined by reviewing a variety of sources. Some of these sources include the claims themselves, dictionaries and treatises, and the written description, the drawings, and the prosecution history. " *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298 (Fed. Cir. 2003)(citations omitted).

The Federal Circuit in *Phillips* noted that "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." 415 F.3d at 1314 . The court noted that "[i]n such cir-

11

cumstances, general purpose dictionaries may be helpful." *Id.* However, the court also noted that "[i]n many cases that give rise to litigation, * * * determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' " *Id.* (quoting *Innova*, 381 F.3d at 1116).

Indeed, the Federal Circuit has long held that dictionaries and technical treatises may, in appropriate circumstances, be considered along with other intrinsic evidence in resolving the disputed meaning of claim terms. *Vitronics*, 90 F.3d at 1584 n.6. In *Phillips*, the court also explained that dictionaries and treatises may be useful in claim construction, in the sense of providing the court with a background understanding of the technology, but the Federal Circuit clearly and pointedly placed dictionaries and the like in the category of "extrinsic evidence" ("[w]ithin the class of extrinsic evidence, the court has observed that dictionaries and treatises can be useful in claim construction."), along with expert testimony, and gave five reasons why such evidence was less reliable than intrinsic evidence:

- "First, extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning."

- "Second, while claims are construed as they would be understood by a hypothetical person of skill in the art, extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent."

- "Third, extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence. The effect of that bias can be exacerbated if the expert is not one of skill in the relevant art or if the expert's opinion is offered in a form that is not subject to cross-examination."

12

- "Fourth, there is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction question. In the course of litigation, each party will naturally choose the pieces of extrinsic evidence most favorable to its cause, leaving the court with the considerable task of filtering the useful extrinsic evidence from the fluff."

- "Finally, undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents."

415 F.3d at 1318-19.

In rejecting the "dictionaries first" analysis of *Texas Digital*, the *en banc* court in *Phillips* also explained that focusing on a dictionary definition distorts the underlying claim analysis:

> The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent. Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification. The patent system is based on the proposition that claims cover only the invented subject matter. As the Supreme Court has stated, "[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent." *Merrill v. Yeomans*, 94 U.S. at 573-74. The use of a dictionary definition can conflict with that directive because the patent applicant did not create the dictionary to describe the invention. Thus, there may be a disconnect between the patentee's responsibility to describe and claim his invention, and the dictionary editors' objective of aggregating all possible definitions for particular words.

*Phillips*, 415 F.3d at 1321, and explained that "[t]he problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive. The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down." *Id.*

13

*Phillips*, however, was not the first case to criticize reliance on dictionary definitions.  The Federal Circuit has previously explained that abstract dictionary definitions are not necessarily determinative of the meaning of claim language.  *Brookhill-Wilk 1*, 334 F.3d at 1300; *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1324 (Fed. Cir. 2001)("We cannot look at the ordinary meaning of the term 'frame' in a vacuum")."  Indeed, the Federal Circuit and one of its predecessor courts, the CCPA, has long cautioned against over-reliance on dictionary definitions alone in construing claims:

> Words are used in many senses and often have diametrically opposed meanings, depending upon the sense in which they are used.  * * * But the words in which a claim is couched may not be read in a vacuum. One need not arbitrarily pick and choose from the various accepted definitions of a word to decide which meaning was intended as the word is used in a given claim. The subject matter, the context, etc., will more often than not lead to the correct conclusion.

*Liebscher v. Boothroyd*, 258 F.2d 948, 951 (C.C.P.A. 1958).

The Federal Circuit has also cautioned against the use of non-scientific dictionaries to define technical terms "lest dictionary definitions * * * be converted into technical terms of art having legal, not linguistic significance." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998).  Non-technical dictionaries, of course, may be used as a guide to the intended or ordinary meaning of non-technical terms being used in a non-technical context, or even technical terms being used in an "ordinary way." *See Dow Chem. Co. v. Sumitomo Chem. Co.*, 257 F.3d 1364, 1373 (Fed. Cir. 2001)("technical terms often have an 'ordinary meaning' as understood by one of ordinary skill in the art, although these same terms may not be readily familiar to a judge, or may be familiar only in a different context.").  But, general-usage dictionaries are not helpful where artisans in the field attach a special meaning to a claim term – or no meaning at all.  *See Vanderlande Indus. Nederland BV v. United States Int'l Trade Comm'n*, 366 F.3d 1311, 1321 (Fed. Cir. 2004)("Claims are to be construed from the vantage point of a person skilled in the relevant art.  To the extent that this artisan would understand a claim term to have the same meaning in the art as that term has in common, lay usage, a general-usage dictionary can be a helpful aid to claim construction.  But where evidence -- such as expert testimony credited by the factfinder, or technical dictionaries -- demonstrates that artisans would attach a special meaning to a claim term, or, as here, would attach no meaning at all to that claim term (independent of the specification), general-usage dictionaries are rendered irrelevant with

14

respect to that term; a general-usage dictionary cannot overcome credible art-specific evidence of the meaning or lack of meaning of a claim term.").

In *Phillips*, the court expanded its criticism of using general dictionaries to define claim terms: "Dictionaries, by their nature, provide an expansive array of definitions. General dictionaries, in particular, strive to collect all uses of particular words, from the common to the obscure. By design, general dictionaries collect the definitions of a term as used not only in a particular art field, but in many different settings. In such circumstances, it is inevitable that the multiple dictionary definitions for a term will extend beyond the 'construction of the patent [that] is confirmed by the avowed understanding of the patentee, expressed by him, or on his behalf, when his application for the original patent was pending.' Thus, the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent." 415 F.3d at 1321-22 (alteration in original)(citation omitted).

The court also criticized the use of technical dictionaries, "[e]ven technical dictionaries or treatises, under certain circumstances, may suffer from some of these deficiencies. There is no guarantee that a term is used in the same way in a treatise as it would be by the patentee. In fact, discrepancies between the patent and treatises are apt to be common because the patent by its nature describes something novel," and dictionaries in general: "Moreover, different dictionaries may contain somewhat different sets of definitions for the same words. A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another. Finally, the authors of dictionaries or treatises may simplify ideas to communicate them most effectively to the public and may thus choose a meaning that is not pertinent to the understanding of particular claim language. The resulting definitions therefore do not necessarily reflect the inventor's goal of distinctly setting forth his invention as a person of ordinary skill in that particular art would understand it." *Id.* at 1322 (citation omitted).

15

Thus, while the court in *Phillips* acknowledged that "[a] dictionary definition has the value of being an unbiased source 'accessible to the public in advance of litigation,'" *Id.* (quoting *Vitronics*, 90 F.3d at 1585), and reiterated its holding in *Vitronics* that judges are free to consult dictionaries and technical treatises:

> [A]t any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does contradict any definition found in or ascertained by a reading of the patent documents.

*Vitronics*, 90 F.3d at 1584 n.6, clearly the Federal Circuit has communicated that the specification, and secondly, the prosecution history, is of paramount importance in construing disputed claim language, as discussed further below. *See also Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1305 (Fed. Cir. 2005)("The claim does not state explicitly whether the 'bone interface' and the 'bone segment' must be in contact. However, we may refer to the dictionary to begin understanding the ordinary meaning of these claim terms, 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'").

### e) Claim Terms Construed in Context With Other Words in the Claim

In *Brookhill-Wilk 1*, 334 F.3d at 1300, the Federal Circuit emphasized that disputed claim terms must be viewed in the context of the surrounding words used in the claims: "While dictionaries and treatises are useful resources in determining the ordinary and customary meaning or meanings of disputed claim terms, the correct meaning of a word or phrase is informed only by considering the surrounding text. This is why consulting dictionary definitions is simply a first step in the claim construction analysis and is another reason why resort must always be made to the surrounding text of the claims in question, the other claims, the written description, and the prosecution history."

In *Pause Technology LLC v. TiVo Inc.*, 419 F.3d 1326 (Fed. Cir. 2005), the Federal Circuit similarly noted that "'[p]roper claim construction * * * demands interpretation of the entire claim in context, not a single element in isolation.'" *Id.* at 1331 (alteration in original)(quoting *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999). *See also ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003)("While certain terms may be at the center of the claim

16

construction debate, the context of the surrounding words of the claim also must be considered
* * *.'").

In *Phillips* , the Federal Circuit likewise noted that: "Quite apart from the written description
and the prosecution history, the claims themselves provide substantial guidance as to the meaning of
particular claim terms." 415 F.3d at 1314 (citing *Vitronics*, 90 F.3d at 1582, and *ACTV*, 346 F.3d at
1088). For example, using the term at issue in *Phillips*, the term "baffles" *per se* did not connote a
particular material, but "<u>steel</u> baffles" did.

In short, a court must give meaning to all of the words in a claim. *See Exxon Chem. Patents,
Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995), *cert. denied,* 518 U.S. 1020 (1996), and is not
free to read any limitations out of a claim. *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 93
F.3d 1572, 1582 (Fed. Cir. 1996).

### f)   Other Patent Claims – Consistency and Differentiation

The court, in construing disputed terms and phrases may, and perhaps must, consider other
unasserted claims as well. *Vitronics*, 90 F.3d at 1582. One reason for doing so is to maintain consis-
tency among the claims: "The fact that we must look to other claims using the same term when in-
terpreting a term in an asserted claim mandates that the term be interpreted consistently in all
claims," *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995), *cert. denied,* 516
U.S. 987 (1995), unless "the language of the written description is sufficient to put a reader on notice
of the different uses of a term, and where those uses are further apparent from publicly-available
documents referenced in the patent file * * *." In such a case "it is appropriate to depart from the
normal rule of construing seemingly identical terms in the same manner." *Pitney Bowes, Inc. v. Hewlett-
Packard Co.*, 182 F.3d 1298, 1311 (Fed. Cir. 1999). Dependent claims may aid in interpreting the
scope of the claims from which they depend, *Laitram Corp. v. NEC Corp.*, 62 F.3d 1388, 1392 (Fed.
Cir. 1995), because the court should "not interpret an independent claim in a way that is inconsistent
with a claim which depends from it * * *." *Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440,
1445 (Fed. Cir. 1997)(citation omitted).

17

Another reason for doing so is the doctrine of claim differentiation.  In *Seachange International, Inc. v. C-COR Inc.*, 413 F.3d 1361 (Fed. Cir. 2005), the Federal Circuit explained:

> The doctrine of claim differentiation stems from "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999). Although the doctrine is at its strongest "where the limitation sought to be 'read into' an independent claim already appears in a dependent claim," *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004), there is still a presumption that two independent claims have different scope when different words or phrases are used in those claims, *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1365-69 (Fed. Cir. 2000); see also *Tandon Corp. v. U.S. Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987). However, the doctrine "only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Kraft*, 203 F.3d at 1368 (internal quotations omitted). "[T]he doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence. * * * [C]laims that are written in different words may ultimately cover substantially the same subject matter." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998).

413 F.3d at 1368-69 (alterations in original).

The court in *Phillips* reiterated those principles:  "Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.  Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims.  Differences among claims can also be a useful guide in understanding the meaning of particular claim terms.  For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." 415 F.3d at 1314-15 (citations omitted).

### g)  Prior Art Cited During Prosecution or Incorporated by Reference May Provide a Guide to Proper Construction

The Federal Circuit has held that prior art listed in a patent may be used to guide claim construction.  *See V-Formation*, 401 F.3d 1307, 1311.  And in *AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374 (Fed. Cir. 2005), the court held that prior art incorporated by reference in a patent

specification may be used as a guide:  "[b]ecause AquaTex chose to incorporate by reference the teachings of three United States Patents to define the scope of the term 'fiberfill,' these publications are highly relevant to one of ordinary skill in the art for ascertaining the breadth of the claim term." *Id.* at 1381.

## 2.    Construction in Light of the Specification

"The written description is considered, in particular to determine if the patentee acted as his own lexicographer, as our law permits, and ascribed a certain meaning to those claim terms." *Digital Biometrics*, 149 F.3d at 1344.  In that sense, the specification functions more or less as a dictionary "when it expressly defines terms used in the claims or when it defines terms by implication." *Vitronics*, 90 F.3d at 1582.  Even beyond that, though, the Federal Circuit has noted that "the specification is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.*  Claims, for that reason, are construed in light of the specification. *See Fuji Photo Film Co., v. United States Int'l Trade Comm'n*, 386 F.3d 1095, 1098 (Fed. Cir. 2004)("[c]laims must be read in the context of the specification of which they are a part,"); *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 540 (Fed. Cir. 1999).

Doing so puts the claims in the context of the invention actually disclosed, *Astrazeneca AB v. Mutual Pharmaceutical Co.*, 384 F.3d 1333, 1337 (Fed. Cir. 2004)("On this view, the patent is an integrated document, with the claims 'pointing out and distinctly claiming,' 35 U.S.C. § 112, the invention described in the rest of the specification and the goal of claim construction is to determine what an ordinary artisan would deem the invention claimed by the patent, taking the claims together with the rest of the specification."), and permits one to determine whether a patentee disclaimed subject matter, or described a particular embodiment as being important to the invention, or used a term that simply requires reference to the specification or prosecution history to determine the scope of the claim. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366-67 (Fed. Cir. 2002). *See also Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1379 (Fed. Cir. 2005)("[b]ecause the specification makes clear that the invention involves a two-stage interrupt mode, the intrinsic evidence binds Boss to a narrower definition of "interrupt" than the extrinsic evidence might support.").

19

Although the specification, as the court explained in *Philips*, is the principal guide to the meaning of the claims, courts must also guard against improperly reading limitations from the specification into the claims, as discussed above. The familiar claim construction canons are: "(a) one may not read a limitation into a claim from the written description, but (b) one may look to the written description to define a term already in a claim limitation, for a claim must be read in view of the specification of which it is a part. These two rules lay out the general relationship between the claims and the written description. As rules at the core of claim construction methodology, they provide guideposts for a spectrum of claim construction problems." *Renishaw*, 158 F.3d at 1248 (citations omitted). The Federal Circuit has recognized, though, "that there is sometimes a fine line between reading a claim in light of the specification, and reading a limitation into a claim from the specification." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004). In *Phillips* as well, the court noted that "we recognize that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice," and advised that "the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." 415 F.3d at 1323. And, the court in *Phillips* also emphasized that one of ordinary skill in the art reads the claims as part of the patent as a whole ("Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."). *Id.* at 1313.

The difference between reading claims in light of the specification and reading limitations from the specification into the claims, the Federal Circuit has said, may turn on how the specification characterizes the claimed invention. *See SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir. 2003). In *Phillips*, the court explained that "[t]o avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case." 415 F.3d at 1323. According to the court, "[m]uch of the time, upon reading the specification in

20

that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.* "The manner in which the patentee uses a term within the specification and claims usually will make the distinction apparent." *Id.* (citing *Snow v. Lake Shore & M.S. Ry. Co.*, 121 U.S. 617, 630 (1887)). *See also Rhodia Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1378 (Fed. Cir. 2005)("[b]ecause the only measurement of the dust produced by Examples 5 and 10 was articulated in terms of the DIN 53 583 standard, the district court properly incorporated that articulation into its construction of the term 'dust-free and non-dusting.'  The results of the DIN testing showed that Example 5 produced more dust than Example 10.  Accordingly, the court defined the outer limit for the level of dust created by the invention by reference to the DIN test results for Example 5.").

Accordingly, the Federal Circuit has said that one must "look[ ] to whether the specification refers to a limitation only as a part of less than all possible embodiments or whether the specification read as a whole suggests that the very character of the invention requires the limitation be a part of every embodiment." *Alloc, Inc. v. United States Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003).  The Federal Circuit has also observed that "[a]lthough a statement's location is not 'determinative,' the location can signal the likelihood that the statement will support a limiting definition of a claim term. Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term. * * * Statements that describe the invention as a whole are more likely to be found in certain sections of the specification, such as the Summary of the Invention. * * * Accordingly, other things being equal, certain sections of the specification are more likely to contain statements that support a limiting definition of a claim term than other sections, although what import to give language from the specification must, of course, be determined on a case-by-case basis." *C.R. Bard, Inc. v. United States Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004)(citations omitted).

Nevertheless, the Federal Circuit has made clear that "[i]t is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993). *See also Glaxo Wellcome, Inc. v. Andrx Pharms., Inc.*, 344 F.3d

1226, 1233 (Fed. Cir. 2003)("When a claim term has an accepted scientific meaning, that meaning is generally not subject to restriction to the specific examples in the specification."). That is, "[t]he written description * * * is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004). If the court does not need to rely on a limitation to interpret what a patentee meant by a particular term or phrase in a claim, "that limitation is 'extraneous' and cannot constrain the claim." *Renishaw*, 158 F.3d at 1249.

The Federal Circuit has also cautioned that a "preferred embodiment" disclosed in a specification "is just that, and the scope of a patentee's claims is not necessarily or automatically limited to the preferred embodiment." *Amhil Enters. Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1559 (Fed. Cir. 1996); *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1336 (Fed. Cir. 2005)("absent a clear disclaimer in the specification, the embodiments in the specification do not limit broader claim language."). *See also Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1357 (Fed. Cir. 2004)("The district court erred by placing too much emphasis on the specification's discussion of the preferred embodiments, rather than the meaning of the claims themselves."). On the other hand, in some instances, the written description requirement of 35 U.S.C. § 112(1) warrants a claim construction that encompasses only the disclosed embodiment. *See Laitram Corp. v. Morehouse Indus.*, 143 F.3d 1456, 1463 (Fed. Cir. 1998); *N. Am. Vaccine, Inc. v. Am. Cyanamid Co.*, 7 F.3d 1571, 1576-77 (Fed. Cir. 1993).

Similarly, a construction that does not cover the preferred embodiment is suspect. *See Nellcor Puritan Bennett, Inc. v. Masimo Corp.*, 402 F.3d 1364, 1368 (Fed. Cir. 2005)("a construction that excludes all of the embodiments of an invention is 'rarely, if ever, correct,' ")(quoting *Vitronics*, 90 F.3d at 1583). On the other hand, "limitations may be construed to exclude a preferred embodiment if the prosecution history compels such a result." *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005)(citing *Elekta Instrs. S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308 (Fed. Cir. 2000)).

"Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. * * * The construction that stays true to the claim language and most naturally aligns with the

22

patent's description of the invention will be, in the end, the correct construction." *Renishaw*, 158 F.3d at 1250; *Phillips*, 415 F.3d at 1316 (adopting the same).

### 3.    Prosecution History

In similar fashion, "[t]he prosecution history is relevant because it may contain contemporaneous exchanges between the patent applicant and the PTO about what the claims mean." *Digital Biometrics*, 149 F.3d at 1344. "The prosecution history, which we have designated as part of the 'intrinsic evidence,' consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[A]rguments made during prosecution shed light on what the applicant meant by its various terms," *Morehouse Industries*, 143 F.3d at 1462 (Fed. Cir. 1998); *see also Vitronics*, 90 F.3d at 1582, "whether relied on by the examiner or not." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004).

Thus, the trial court may be required to examine the prosecution history, when it is of record, to determine whether the patentee (1) has explained what was meant by language used in a claim or (2) has "disclaimed" a potential claim construction in an amendment to the claim or in an argument. *Southwall*, 54 F.3d at 1576; *Interactive Gift*, 256 F.3d at 1331. *See also Nystrom II*, 424 F.3d 1136, 1145 ("What *Phillips* now counsels is that in the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public -- *i.e.*, those of ordinary skill in the art -- that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source.").

In particular, the Federal Circuit has reasoned that "[t]he public notice function of patents requires that a patentee be prevented from expressly stating during prosecution that the claims do not cover a particular device and then later suing for infringement by that same device. Allowing such a suit would be unfair to the public, particularly the manufacturer of the accused device, which was entitled to rely on the surrender of claimed subject matter made in the prosecution history and contained in the file wrapper." *Pall Corp. v. PTI Techs., Inc.*, 259 F.3d 1383, 1393 (Fed. Cir. 2001). Accordingly, the Federal Circuit construes claims "to exclude any interpretation that was disclaimed

23

during prosecution." *Southwall*, 54 F.3d at 1576. That is, the "doctrine of prosecution disclaimer" precludes patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

In *Phillips*, the court explained that "[l]ike the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent. Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent." 415 F.3d at 1317. However, the court explained, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*. "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* Also, the prosecution history of related patents may *sometimes* be used to aid in claim construction if that relationship is familial or such other patents have been incorporated by reference. *See Goldenberg v. Cytogen*, 373 F.3d 1158, 1167 (Fed. Cir. 2004)("[i]n the absence of an incorporation into the intrinsic evidence, this court's precedent takes a narrow view on when a related patent or its prosecution history is available to construe the claims of a patent at issue and draws a distinct line between patents that have a familial relationship and those that do not.").

On the other hand, in *Omega Engineering*, the Federal Circuit also held that "where the patentee has <u>unequivocally disavowed</u> a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." 334 F.3d at 1324 (emphasis added). In *SanDisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278 (Fed. Cir. 2005), the Federal Circuit explained that "[w]hen the patentee makes clear and unmistakable prosecution arguments limiting the meaning of a claim term in order to overcome a rejection, the courts limit the relevant claim term to exclude the disclaimed matter." 415 F.3d at 1286. But, "[a]n ambiguous disclaimer, however, does not advance the patent's notice function or justify public reliance, and the court will not use it to limit a claim term's ordinary meaning," and "[t]here is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than

24

one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term." *Id.* at 1287. *But see, North American Container*, 415 F.3d 1335 (finding disclaimer).

Also, in *Nystrom II,* the Federal Circuit explained that an express "disavowal" is not always necessary if a patentee uses a term to impart a specific meaning, noting that the decision in *AquaTex Industries* "illustrates this principle," *i.e.*, the patentee had used the term "fiberfill" throughout the written description to refer to synthetic materials. According to the court, "[a]lthough the written description indicated that the composition of the fiberfill was not known to be critical, we held that 'the context of the specification 'makes clear that the patentee did not intend the term [fiberfill] to encompass' natural materials.' * * * Although there was no disavowal of natural materials, we held that the consistent use of the term 'fiberfill' to refer to synthetic materials and the extrinsic definitions supporting that interpretation led to the conclusion that a person of ordinary skill in the art would have understood the term to be limited to synthetic materials." *Nystrom II*, 424 F.3d at 1145.

### 4.    Extrinsic Evidence

The Federal Circuit has explained that "[i]n most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence." *Vitronics*, 90 F.3d at 1583. However, the court has also recognized that "the testimony of one skilled in the art about the meaning of claim terms at the time of the invention will almost always qualify as relevant evidence." *Eastman Kodak*, 114 F.3d at 1555. In *Phillips*, the court reiterated that "[w]e have also held that extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." 415 F.3d at 1318.

Thus, a court may admit and accept testimony by the parties' expert witnesses as background in the technical area at issue, *Mantech Environmental Corp. v. Hudson Environmental Systems, Inc.*, 152 F.3d 1368, 1372-73 (Fed. Cir. 1998), and "it is entirely appropriate, perhaps even preferable, for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the

patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Pitney Bowes*, 182 F.3d at 1309. " 'But testimony on the technology is far different from other expert testimony, whether it be of an attorney, a technical expert, or the inventor, on the proper construction of a disputed claim term * * *. The latter kind of testimony may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms.' " *Id.* at 1308-09 (quoting *Vitronics*, 90 F.3d at 1585). Thus, extrinsic evidence may be used by the court to assist in the proper understanding of a disputed limitation. But, such evidence may not be used to vary, contradict, expand, or limit the claim language from how it is defined in the specification or file history. *Vitronics*, 90 F.3d at 1584-85. In particular, the court has held that "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.' " *Phillips*, 415 F.3d at 1318 (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998). *See also Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1193 (Fed. Cir. 2005)("That single conclusory statement by Mr. Faillace, however, is insufficient to demonstrate that the term 'mounted on' had that meaning to a person of ordinary skill in the art at the time of the patent application, particularly in light of the fact that Mr. Faillace's definition departs significantly from the ordinary meaning of the phrase."); *Network Commerce, Inc.*, 422 F.3d at 1361 ("Here Coombs does not support his conclusion with any references to industry publications or other independent sources. Moreover, expert testimony at odds with the intrinsic evidence must be disregarded. * * * That is the case here.")(citations omitted).

### 5.   Means-Plus-Function Limitations

#### a)  Overview

This case involves claim limitations assertedly drawn as means-plus-function limitations under 35 U.S.C. § 112(6). Section 112(6) provides that:

> An element in a claim for a combination may be expressed as a means or step for
> performing a specified function without the recital of structure, material or acts
> in support thereof, and such claim shall be construed to cover the corresponding

26

> structure, material, or acts described in the specification and equivalents thereof.
> [Emphasis added.]

Section 112(6) thus allows "an applicant [to] describe an element of his invention by the result accomplished or the function served, rather than describing the item or element to be used * * *." *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 27 (1997). When an applicant does so, by the terms of the statute, "such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id.* (quoting § 112(6)).

The general hallmarks of a means-plus-function element are: (1) the element is expressed in terms using "means" or "step" which raises a presumption that there was an intent to invoke § 112(6), *Al-Site Corp. v. VSL International, Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999)("[I]f the word 'means' appears in a claim element in combination with a function, it is presumed to be a means-plus-function element"), *see also Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1584 (Fed. Cir. 1996); (2) a specified function follows the "means" or "step" and is linked to the "means" or "step," *York Products, Inc. v. Central Tractor Farm & Family Center.*, 99 F.3d 1568, 1574 (Fed. Cir. 1996); and (3) there is insufficient structure, material or acts set out in the claim for achieving the specified function. *See Apex v. Raritan*, 325 F.3d 1364, 1372 (Fed. Cir. 2003); *Cole v. Kimberly-Clark Corp.*, 102 F.3d 524, 530-31 (Fed. Cir. 1996), *cert. denied*, 522 U.S. 812 (1997). "Means-plus-function" limitations are construed, as required by § 112(6), to cover the corresponding structure, material or acts described in the specification and equivalents thereof. *In re Donaldson Co.*, 16 F.3d 1189 (Fed. Cir. 1994)(*en banc*).

The Court must decide as a matter of law whether a particular term or phrase is governed by § 112(6). *ACTV*, 346 F.3d at 1087("The determination of the claimed function and corresponding structure of a means-plus-function claim limitation is a question of law, reviewed *de novo*."). *See also Personalized Media Communications LLC v. United States Int'l Trade Comm'n*, 161 F.3d 696, 702 (Fed. Cir. 1998); *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 1115 (2000). *Markman*-type claim construction of a means-plus-function limitation requires that the Court first identify the stated function and secondly identify the corresponding structure, material, or acts described in the specification that is clearly linked to or associated with that function. *See Gemstar-TV Guide Int'l, Inc. v. United States Int'l Trade Comm'n*, 383 F.3d 1352, 1361 (Fed. Cir.

27

2004)("We consult the claim language to determine the function of the limitation. * * * We then consult the written description to determine the corresponding structure necessary to accomplish the stated function."); *Omega Engineering*, 334 F.3d at 1326; *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307-08 (Fed. Cir. 1998).

In connection with the first question, *i.e.*, whether a limitation should be construed as a means-plus-function limitation governed by § 112(6), "[t]he use of the term 'means' is 'central to the analysis,' * * * and has come to be closely associated with means-plus-function claiming." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)(citations omitted). *See also Cross Med. Prods.*, 424 F.3d 1293(construing "anchoring means" and "securing means" as means-plus-function limitations, but construing "anchor seat means" as not a means-plus-function limitation). If the word "means" is used, there is a presumption that the limitation should be construed as means-plus-function limitation. Conversely, if the word "means" is not used, then there is a presumption that the limitation should not be construed as a means-plus-function limitation. Those presumptions, however, are rebuttable.

In particular, the issue is whether the limitations recite sufficient structure to avoid construction under § 112(6). And, once again, claim limitations are viewed through the eyes of one of ordinary skill in the art. Thus, the question is whether one of ordinary skill in the art would view a limitation as reciting sufficient structure to avoid construction as a means-plus-function limitation.

The Federal Circuit has looked to dictionaries and similar sources to determine whether generic terms and phrases, such as "circuit," "connector" and the like, have a structural connotation. For example, the Federal Circuit has noted that "[i]n *Greenberg* and subsequent cases, we have looked to the dictionary to determine if a disputed term has achieved recognition as a noun denoting structure, even if the noun is derived from the function performed. *See Greenberg*, 91 F.3d at 1583 ('Dictionary definitions make clear that the noun "detent" denotes a type of device with a generally understood meaning in the mechanical arts, even though the definitions are expressed in functional terms." *Lighting World*, 382 F.3d at 1360-61. *See also Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319 (Fed. Cir.), *withdrawing prior opinion*, 371 F.3d 1364 (Fed. Cir. 2004)("[t]echnical dictionaries, which are evidence of the understandings of persons of skill in the technical arts, plainly indicate

28

that the term 'circuit' connotes structure."); *CCS Fitness*, 288 F.3d at 1369 (dictionary definitions consulted to determine that an artisan of ordinary skill would understand the term in question to have an ordinary meaning); *Personalized Media Communications*, 161 F.3d at 704 (same).

Although a generic term may not connote any particular structure to one of skill in the art, that is not a requirement. The Federal Circuit has explained that "we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." *Lighting World*, 382 F.3d at 1359-60 ("[W]hile it is true that the term 'connector assembly' does not bring to mind a particular structure, that point is not dispositive. What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.' "). *Id.* at 1360. Thus, terms that denote generic structure, such as "connector," "clamp," "clip" *etc.*, <u>may</u> connote sufficient structure to avoid construction under § 112(6). *Id.* at 1361.

The second step of the analysis is to (1) determine the claimed function in the limitation, and to (2) examine the written description, *i.e.*, the specification, to identify the "structure" that "corresponds" to and performs that function. *See Micro Chem., Inc. v. Great Plains Chem. Co. (Micro Chemical II)*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)(although § 112(6) "requires both identification of the claimed function and identification of the structure in the written description necessary to perform that function," the "statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim," nor "does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function."); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 249 F.3d 1314, 1324 (Fed. Cir. 2001)(a means-plus-function limitation cannot be broadened by "reading out" a function).

In particular, the Court, after identifying the stated function, must identify the "corresponding structure" in the specification that is "clearly linked" to the recited function. *See Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001)(" 'Structure disclosed in the specification is "corresponding" structure only if the specification or prosecution history clearly links

29

or associates that structure to the function recited in the claim.' ")(quoting *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).  *See also Northrop Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003)("Under section 112, paragraph 6, structure disclosed in the specification is 'corresponding' structure 'only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim.' ")(quoting *B. Braun*, 124 F.3d at 1424).

The reason is grounded on the language and underlying rationale of § 112(6).  "The record is clear on why paragraph six [of § 112] was enacted." *In re Donaldson Co.*, 16 F.3d at 1194.  In *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1 (1946), the Supreme Court held that a claim drafted in means-plus-function format was invalid for failure to recite structure.  In *Greenberg*, 91 F.3d at 1583, the Federal Circuit explained that "Congress enacted paragraph six, originally paragraph three, to overrule that holding.  In place of the *Halliburton* rule, Congress adopted a compromise solution, one that had support in the pre-*Halliburton* case law:  Congress permitted the use of purely functional language in claims, but it limited the breadth of such claim language by restricting its scope to the structure disclosed in the specification and equivalents thereof." (emphasis added).  Accordingly, the Court must identify the "corresponding structure" in the specification that is "clearly linked" to the recited function in order to determine the scope of the claim.

The Federal Circuit has advised that the specification must be read as a whole to determine the structure for performing the claimed function.  *See Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001)("The specification must be read as a whole to determine the structure capable of performing the claimed function. * * * In construing terms used in patent claims, it is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent.  In addition, it is important to construe claim language through the 'viewing glass' of a person skilled in the art.")(citations omitted).  However, the Federal Circuit has also cautioned that structure  identified as "corresponding structure" must actually perform the recited function, rather than merely enable the pertinent structure to perform the recited function.  *Asyst Technologies*, 268 F.3d at 1371("The corresponding structure to a function set forth in a means-plus-function limitation must actually perform the recited function, not merely enable the pertinent structure to operate as intended * * *.").

30

Where there is a single embodiment disclosed in the specification for performing the claimed function, the "corresponding structure" is generally limited to that structure – and, for purposes of determining infringement, statutory equivalents. *See Cross Medical Products*, 424 F.3d at 1304 ("[B]ecause there is only one embodiment described in the specification to secure the anchor to the bone -- a polyaxial screw and anchor structure -- there is no basis on which to extend the limitation to cover alternative, non-disclosed structure not shown to be structurally equivalent.").

However, when multiple embodiments, either illustrated in the drawings or described in the specification correspond to the claimed function, § 112(6) requires reading the limitation to cover each embodiment. *See Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1329 (Fed. Cir. 2004)("'Disclosed structure includes that which is described in the patent specification, including any alternative structures identified,' even when the most frequently described structure and embodiment are different.")(quoting *Serrano v. Telular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997). *See also Micro Chemical II*, 194 F.3d at 1258 ("When multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments.").

Also, the "corresponding structure" must take into account what is shown in the drawings and what is described in the specification as well. *See Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005)("Identifying the corresponding structure for the limiting means of claim 9 requires the court to examine the drawings and the abstract in the '178 patent's written description. Either can provide support for the corresponding structure for the 'limiting means.' The specification includes the drawings, * * *. The abstract can also serve to support the corresponding structure for § 112." * * * "When looking to the specification for the structure of a § 112 ¶ 6 claim, one must construe the claim in accordance with all the structures disclosed by the inventor. Here the text of the written description clearly describes how the structure of the 'limiting means' is broader than the single embodiment depicted in the drawing. The written description, therefore, discloses the structure as required by § 112 ¶ 6.")(citations omitted).

There is further a relationship between § 112(6) and the other requirements set out in § 112. Section 112, paragraph 2, requires that the specification conclude with one or more claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his inven-

31

tion." The Federal Circuit has held that for a claim to comply with § 112(2), "it must satisfy two requirements: first, it must set forth what 'the applicant regards as his invention,' and second, it must do so with sufficient particularity and distinctness, *i.e.*, the claim must be sufficiently 'definite.' " *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1377 (Fed. Cir. 2000). The second requirement, in essence, is a requirement for precision in claiming.

In the context of § 112(6), the Federal Circuit has explained that there is a "duty of a patentee to clearly link or associate structure with the claimed function," and such "is the *quid pro quo* for allowing the patentee to express the claim in terms of function under section 112, paragraph 6." *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003)("The public should not be required to guess as to the structure for which the patentee enjoys the right to exclude. The public instead is entitled to know precisely what kind of structure the patentee has selected for the claimed functions, when claims are written according to section 112, paragraph 6.") *Id.* at 1220). Also, as noted above, § 112(1) requires applicants to provide a written description of the invention and an enabling disclosure. "[F]ailure to disclose adequate structure corresponding to the recited function in accordance with 35 U.S.C. § 112, paragraph 1, results in the claim being of indefinite scope, and thus invalid, under 35 U.S.C. § 112, paragraph 2." *Budde*, 250 F.3d at 1376. *See also Omega Engineering*, 334 F.3d at 1332 (explaining that statements from experts cannot be used to "rewrite the patent's specification" to create a clear link where the language in the specification provides none); *Medical Instrumentation*, 344 F.3d at 1212 ("Indeed, the requirement of looking to the disclosure to find the corresponding structure comes from section 112, paragraph 6 itself. It is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent.").

Once again, though, patents are construed through the "viewing glass" of a person skilled in the art. *See, e.g., Budde*, 250 F.3d at 1376 ("Whether or not the specification adequately sets forth structure corresponding to the claimed function necessitates consideration of that disclosure from the viewpoint of one skilled in the art."); *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999)("[I]n order for a claim to meet the particularity requirement of ¶ 2, the corresponding structure(s) of a means-plus-function limitation must be disclosed in the written description in such a manner that one skilled in the art will know and understand what structure corresponds to

32

the means limitation."); *S3 Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001)("[The law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of the invention. * * * To hold otherwise would require every patent document to include a technical treatise for the unskilled reader. Although an accommodation to the 'common experience' of lay persons may be feasible, it is an unnecessary burden for inventors and has long been rejected as a requirement of patent disclosures.")(citations omitted); *Creo Prods, Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002)(construing "a standard electric motor or other conventional means" in the disclosure – "Under our case law, interpreting § 112, ¶ 6, knowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness. * * * Thus, in addressing the question whether a means-plus-function limitation satisfies the definiteness requirement, we focus our inquiry on whether one skilled in the art would have understood that the specification of each patent disclosed structure capable of performing the function recited in the claim limitation.")(citations omitted).

On the other hand, testimony by one of ordinary skill in the art cannot supplant the total absence of structure from the specification. *See Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291 (Fed. Cir. 2005). The Federal Circuit has explained:

- "The requirement that the claims 'particularly point[ ] out and distinctly claim[ ]' the invention is met when a person experienced in the field of the invention would understand the scope of the subject matter that is patented when reading the claim in conjunction with the rest of the specification. 'Although expert testimony and declarations are useful to confirm that the construed meaning is consistent with the denotation ascribed by those in the field of the art, such extrinsic evidence cannot be used to vary the plain language of the patent document.' " 412 F.3d at 1298 (alterations in original)(citation omitted).

- " '[I]f one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language. If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.' " *Id.* (alteration in original)(quoting *In re Donaldson Co.*, 16 F.3d at 1195).

33

- " 'The specification must be read as a whole to determine the structure capable of performing the claimed function.' " *Id.* (quoting *Budde*, 250 F.3d at 1379).

- "A structure disclosed in the specification qualifies as 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (citing *B. Braun*, 124 F.3d at 1424).

- "This duty to link or associate structure to function is the *quid pro quo* for the convenience of employing § 112, ¶ 6." *Id.* (citing *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997)).

- " 'Fulfillment of the § 112, ¶ 6 trade-off cannot be satisfied when there is a total omission of structure.' " *Id.* (quoting *Atmel Corp. v. Info. Storage Devices*, 198 F.3d 1374, 1382 (Fed. Cir. 1999)).

- "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Id.* (citing *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002)).

### b)  Statutory Equivalents Distinguished From Equivalents Under the Doctrine of Equivalents

The parties have, in their submissions, confused -- or failed to distinguish between -- (1) statutory equivalents under § 112(6), and (2) equivalents under the doctrine of equivalents. Although the two are generally related, the analysis is distinct -- and, perhaps, more to the point, neither is the subject of *Markman*-type claim construction, at least in the present context.

As noted above, § 112(6) provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material or acts in support thereof, and <u>such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.</u> [Emphasis added.]

Thus, in order to prove <u>literal</u> infringement, a patentee must prove, by a preponderance of the evidence, that the accused products have that <u>same</u> "corresponding structure" <u>or</u>, by virtue of § 112(6), "<u>equivalents thereof.</u>" That is sometimes referred to as "<u>statutory</u> equivalents" to distinguish infringement under the doctrine of equivalents (discussed below). *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1375 n.5 (Fed. Cir. 2003)(*en banc*)("35 U.S.C. § 112, paragraph 6

34

(2000), includes a statutory equivalent as part of the literal infringement inquiry."). Thus, deciding literal infringement under § 112(6) includes deciding statutory equivalents.

If the Court determines that a limitation should be construed as a means-plus-function limitation under § 112(6), as discussed above, the Court must then also determine, as part of the claim construction analysis, (1) the function recited in such a limitation (which typically is clear from the claim language and frequently, but not always, follows the word "for"), and (2) the "structure" disclosed in the specification that "corresponds" to and performs that function (which many times is not clear – and is the subject of a dispute between the parties such as here). Those decisions are treated as issues of law subject to *de novo* review by the Federal Circuit. The Court must then subsequently decide, as part of the infringement inquiry, whether the accused device (or process) uses (1) the same structure that has been identified as the "corresponding structure" in the specification of the patent-in-suit, or (2) a structure that is "equivalent" to that "corresponding structure."

Although the foregoing questions that a court must preliminarily resolve in connection with alleged means-plus-function limitations, namely (1) whether such limitations are actually drawn in means-plus-function form requiring construction under § 112(6), and, if so (2) the claimed function in such a limitation, and (3) the "structure" that "corresponds" to and performs that function, have been treated as questions of law, generally the ultimate question of infringement, *i.e.*, whether an accused product uses the same or an equivalent structure under § 112(6), has been treated as a question of fact. *See Cross Medical Products*, 424 F.3d at 1316, 1317 ("[T]here is a genuine issue of material fact as to whether the set screw applies substantially equal forces on opposite sides of the channel, and thus whether there is identity of function," "We also reject the other arguments that both sides make in attempting to prevail on equivalents as a matter of law."); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000)("Whether an accused device or method infringes a claim with a § 112, ¶ 6 limitation, *i.e.*, whether it performs the identical function with the same structure, materials, or acts described in the specification or an equivalent thereof, is a question of fact. *See also Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1268-69 * * * (Fed. Cir. 1999) (citing *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 975 * * * (Fed. Cir. 1985), and indicating that the holding in *Markman v. West-view Instruments, Inc.*, 52 F.3d 967, 976-79 * * * (Fed. Cir. 1995), that claim construction is a question of law did not affect the holding in *Palumbo* that whether an accused device is a § 112, ¶ 6 equivalent

35

is a question of fact). Thus, in order to uphold a summary judgment of noninfringement, we must conclude that no reasonable jury could have found otherwise."). *See also Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1466-67 (Fed. Cir. 1998)(concurring opinion by Chief Judge Mayer: "to complete the construction of these means-plus-function terms, the judge must look to the structures, materials, or acts disclosed in the patent's specifications and to their equivalents. To determine the scope of such equivalents, the district court must resolve questions of fact by resorting to the expertise of the fact finder. * * * For pragmatic reasons, the resolution of this factual determination is often made at the same time the fact finder determines infringement * * *")(citation omitted).

In conjunction with their proposed constructions for several of the claim limitations, the REM Parties have argued that Erchonia is estopped from asserting infringement under the doctrine of equivalents, citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.* (*Festo VII*), 535 U.S. 722 (2002). For example, the REM Parties argue that *Festo VII* stands for the proposition that "if a claim element was amended or added for reasons of patentability of the claim, prosecution history estoppel precludes application of the Doctrine of Equivalents for purposes of infringement," REM Parties' Brief at 12 n. 5, and then later urge, for example in connection with the "wand" limitation, that if a limitation was amended during prosecution "Erchonia is estopped from asserting infringe-ment of the claim element under the Doctrine of Equivalents." REM Parties' Brief at 16.

During the hearing on August 26, 2005, Erchonia indicated that it was uncertain whether the "equivalents" arguments made in the REM Parties' briefs related to the doctrine of equivalents or statutory equivalents under § 112(6). Tr. 25-26. The REM Parties confirmed, however, that those arguments were directed toward the doctrine of equivalents, rather than statutory equivalents. Tr. 30.

For the foregoing reasons, it is simply improper at this stage to consider either (1) the ques-tion of statutory equivalents under § 112(6), or (2) the issue of equivalents under the doctrine of equivalents. Accordingly, nothing in this report and recommendation should be construed as re-solving in any way (1) the question of statutory equivalents under § 112(6), or (2) the issue of equiva-lents under the doctrine of equivalents.

36

### 6.     Construction for Infringement v. Construction for Validity

Lastly, the Court's interpretation or construction of disputed terms in patent claims applies equally to the issues of infringement and validity. That is, the interpretation given patent claims to determine infringement must be the same interpretation given those claims in deciding validity. *See Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001)("Having construed the claims one way for determining their validity, it is axiomatic that the claims must be construed in the same way for infringement.")(quoting *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1279 (Fed. Cir. 1988).

### 7.     Claim Construction in This Report and Recommendation

Bearing the foregoing in mind, this report summarizes the disclosure of the patent-in-suit, as well as the prosecution history that the parties had provided. In terms of claim construction, the recommended construction begins with the actual claim language, and attempts to discern how one of ordinary skill in the relevant art in the relevant time frame would have understood the disputed terms and phrases in the asserted claims.

The recommended constructions also attempt to account for the fact that claims are not, in fact or theory, interpreted as divorced from the specification of which they are a part. That is, claim construction does not require one to adopt a construction that, in effect, would result from physically cutting the claims from the patent-in-suit, and asking one of ordinary skill in the art to interpret such claims in a vacuum. The *en banc* court in *Phillips* similarly explained: "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification," 415 F.3d at 1312 (citing, *inter alia, Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005))("We cannot look at the ordinary meaning of the term * * * in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.")(alteration in original).

On the other hand, claim constructions that depend too heavily on, or that are limited to the embodiment or embodiments disclosed in the specification, similarly may not reflect the true and accurate scope of the claimed invention. The specification, by statute, no doubt concludes with the

37

claims, 35 U.S.C. § 112(2), but the claims, not the specification, define "the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(2) *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.' ")(quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).

Overall, the following report and recommendation concerning the claim terms in dispute are made with the foregoing principles and guidelines in mind.

### III.
### U.S. Patent No. 6,013,096 – the '096 Patent

The following description of the patent-in-suit is simply that, and should not be interpreted as adopting either of the parties' proposed claim constructions. The actual disclosure of that patent is discussed in greater detail below in conjunction with deciding the construction of the particular disputed terms and phrases.

### A.   Description

The '096 patent issued on January 11, 2000, from application No. 08/971,880, filed on November 19, 1997. An earlier provisional application No. 60/031,620 was filed on November 22, 1996. The '096 patent lists Kevin B. Tucek as the sole inventor.

The '096 patent is generally drawn to "a hand-held laser light generator device for use in medical therapy." '096 patent, col. 1, lines 11-12. Under the heading "Description of the Prior Art," the patent explains that "a laser is basically a device which generates and amplifies light, and does so in the form of an intense coherent beam." '096 patent, col. 1, lines 16-28. One such laser uses helium-neon gas which, according to the patent, has found wide application, including "in several types of medical therapy, primarily so-called unconventional treatments such as laser acupuncture, biostimulation, stimulation of wound healing, and alleviation of pain." '096 patent, col. 1, lines 33-36. According to the patent, however, "[h]elium-neon lasers as well as other types of lasers that have been used heretofore in the aforementioned unconventional medical applications are large in size, have complicated controls and thus are difficult to maneuver and operate. These drawbacks have

38

prevented these lasers from reaching their full potential in such medical applications and thus have impeded the widespread use and acceptance of lasers." '096 patent, col. 1, lines 43-49.

According to the patent, "[t]he present invention provides a hand-held laser light generator device which is designed to satisfy the aforementioned need. The hand-held laser light generator device of the present invention is intended to be used in medical therapy. The hand-held laser light generator device is compact in size and has simple controls which are easy to use. The hand-held laser light generator device includes a laser which is freely movable so as to enable the user to direct a beam of light onto a desired location, such as on a surface of skin of a patient being contacted by the beam of light." '096 patent, col. 1, lines 56-65.

In particular, under the heading "Summary of the Invention," the patent explains that "the present invention is directed to a hand-held laser light generator device" comprising seven components, namely "(a) a wand defining an interior cavity and capable of being retained in a hand of a user; (b) means for generating a beam of laser light mounted in the interior cavity of the wand and therewith being freely movable so as to enable the user to direct the beam of laser light onto a desired location; (c) an optical arrangement mounted in the interior cavity of the wand for receiving the generated beam of laser light from the generating means and transforming the generated beam of laser light into a line of laser light; (d) a housing defining an interior chamber and having an exterior; (e) means for supplying electrical power to the generating means being disposed in the interior chamber of the housing; (f) means for electrically interconnecting the laser light beam generating means and the electrical power supplying means; and (g) means for controlling a period of time the beam of laser light is generated." '096 patent, col. 1, line 66 – col. 2, line 15.

The patent further describes those components as follows:

- "[T]he wand is a substantially elongated hollow tube having an open forward end and a rear end."

- "The generating means is a semiconductor diode laser preferably using less than one watt of power. The generated beam of laser light is in the visible/UV energy spectrum and has a wavelength of about 635 nm and a red color."

- "The optical arrangement in the wand includes a collimating lens and a line generating prism. The collimating lens and line generating prism are disposed in a serial relation to the laser between the open forward end of the wand and the laser. The colli-

39

mating lens and line generating prism transform the generated beam of laser light into the line of laser light."

- "The housing also has a cradle preferably mounted to a side of the exterior of the housing for releasably securing the wand thereto and a clip mounted preferably to the rear of the exterior of the housing for releasably securing the housing to an article of clothing worn by the user."

- "The electrical power supplying means is preferably a battery which supplies power the laser."

- "The electrical interconnecting means is an electrical cord having opposite ends, one of the opposite ends being attached to the wand and making electrical connection with the laser, the other of the opposite ends being attached to the housing and making electrical connection with the battery."

- "The time period controlling means includes an electrical timing circuit disposed in the interior chamber of and mounted to the housing, a start switch activatable between on and off positions, and a selector knob having multiple time period length setting positions. The start switch and selector knob are mounted to the housing and are accessible at the exterior thereof. The start switch and selector knob are in operable communication with the electrical timing circuit for controlling the initiation of generation of the beam of laser light and the length of the period of time the beam of laser light is generated."

- "The time period controlling means may further include a lock mechanism mounted to the housing and a key for actuating the lock mechanism between a first position in which the lock mechanism permits the start switch to be activated to the on position and a second position in which the lock mechanism prevents the start switch from being activated to the on position."

'096 patent, col. 2, lines 29-58.

    The abstract[5] of the '096 patent similarly explains that the patent discloses a "hand-held laser light generator device" that includes "[1] a wand, [2] a semiconductor diode laser for generating a beam of laser light, [3] an optical arrangement, [4] a housing having an interior chamber, [5] a battery

---

[5]  The Federal Circuit has held that an abstract may be used when construing claims, despite the contrary language of 37 C.F.R. § 1.72(b), PTO Rule 72(b). *See Hill-Rom Co. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.1 (Fed. Cir. 2000)("Citing 37 C.F.R. § 1.72(b), which provides that the abstract of the patent 'shall not be used for interpreting the scope of the claims,' Hill-Rom argues that it would be improper for us to consider the abstract in determining whether the district court correctly construed the claims of the '346 patent. Section 1.72(b), however, is a rule of the Patent and Trademark Office that governs the conduct of patent examiners in examining patent applications; it does not address the process by which courts construe claims in infringement actions. We have frequently looked to the abstract to determine the scope of the invention, and we are aware of no legal principle that would require us to disregard that potentially helpful source of intrinsic evidence as to the meaning of claims.")(citations omitted).

in the housing interior chamber, [6] an electrical cord connecting the laser in the wand with the battery in the housing, [7] an electronic timing circuit, a start switch and a selector knob."

The abstract also further explains those components. For example, the abstract explains that "[t]he wand, capable of being retained in a user's hand, is an elongated hollow tube and defines an interior cavity. The laser is mounted in the wand interior cavity and therewith is freely movable so as to enable the user to direct the beam of laser light onto a desired location."

The abstract explains that "[t]he optical arrangement mounted in the wand interior cavity receives and transforms the generated beam of laser light into a line of laser light," and explains that "[t]he electrical timing circuit is disposed in the housing interior chamber and mounted to the housing. The start switch is activatable between on and off positions while the selector knob has multiple period of time length setting positions. The start switch and selector knob are mounted to the housing and accessible at the exterior thereof and are in operable communication with the electrical timing circuit for controlling initiation of generation of and length of the period of time that the laser light beam is generated."

41

The device 10 is generally illustrated in Figs. 1-3:



The patent explains that "[t]he hand-held laser light generator device 10 emits a beam of laser light B, preferably, with an 80° to 85° spread in a relatively narrow planar configuration to substantially form a line of light L on a surface of skin of a patient being contacted by the laser light beam B. The laser light beam B delivers energy to the human body in a form which is believed to assist in cell regeneration and to increase the size of capillaries to improve blood flow and circulation." '096 patent, col. 3, lines 49-57.

In particular, the patent explains that a laser module 12, mounted in cavity 16 of wand 14, generates laser light beam B, wand 14 "capable of being retained in a hand of a user." '096 patent, col. 3, lines 60-61. The patent further explains that "wand 14 of the device 10 is a substantially elongated hollow tube 32, but can have any other suitable configuration." The patent describes wand 14 as being "open at the forward end 32A and tapers to an opening defined by the rear end

42

32B." The patent describes laser module 12 as "preferably" being "a semiconductor diode laser, which is of a well-known and standard construction," and further that "laser module 12 uses less than one watt of power, though may use any other suitable amount of power." Laser light beam B, according to the patent, is "preferably" in the "visible/UV energy spectrum, has a wavelength of about 635 nm and a red color, but may be any other suitable type for a particular application." '096 patent, col. 4, lines 20-32. The patent also explains that "[a]s can be clearly understood from FIG. 3, the planar beam of laser light B is disposed externally of the wand 14 and produces a line of laser light L preferably in the red color spectrum at a desired location on the suface [sic] of the patient's skin and with the line of laser light L being visible to the user as the X and 14 is held and freely moved by the user in a spaced relationship from and out of contact with the patient." '096 patent, col. 4, lines 43-50.

An "optical arrangement" 18 is also mounted in cavity 16 of wand 14 "for receiving the generated beam of laser light beam and transforming it into the line of laser light L, as represented in FIG. 3." '096 patent, col. 3, line 67 – col. 4, line 3. The patent further explains that "[t]he optical arrangement 18 of the device 10 includes a collimating lens 34 and a line generating prism 36. The collimating lens 34 and the line generating prism 36 are disposed in serial relation to the laser module 12. The optical arrangement 18 is particularly disposed between the open forward end 32A of the wand tube 32 and the laser module 12. The collimating lens 34 and the line generating prism 36 receive and transform the generated beam of laser light B into the line of laser light L." '096 patent, col. 4, lines 33-41. An alternative embodiment is also disclosed: "As an alternative, a suitable mechanical arrangement could be substituted for the optical arrangement 18." '096 patent, col. 4, lines 41-43.

According to the patent, a housing 20 defines "an interior chamber 22 and having an exterior 24, an electrical power supplying means 26 in the form of a battery for supplying electical [sic] power to the laser module 12 being disposed in the interior chamber 22 of the housing 20, an electrical cord 28 having opposite ends 28A, 28B interconnecting the wand 14 with the housing 20, and controlling means 30 for controlling the period of time the beam of laser light B is generated. Specifically, the one end 28A of the cord 28 attached to the wand 14 makes electrical connection with the laser module 12 while the other end 28B of the cord 28 attached to the housing 22 makes elec-

43

trical contact with the controlling means 30 and battery 22. The electrical cord 28 is spirally-wound and provides insulation for one or more electrical conductor wires disposed therein." '096 patent, col. 4, lines 5-19. The housing includes a clip 54 "for releasably securing housing 20 * * * to an article of clothing * * *," '096 patent, col. 5, lines 30-31, and a cradle 52 for releasably securing wand 14 to housing 20. The housing is further illustrated especially in Figs. 4-9, with an accompanying description. '096 patent, col. 4, lines 51-65. Figs. 10-11 illustrate clip 54 in further detail, Figs. 12-14 illustrate cradle 52 in further detail, and Figs. 15-16 illustrate wand 14 in further detail.

Also according to the patent, the "controlling means 30" includes "an electrical timing circuit 44 [shown in Fig. 19] disposed in the interior chamber 22 of the housing 20 and being mounted to the housing 20, a start switch 46, preferably of the push button type, activatable between on and off positions (as seen in FIG. 19), and a selector knob 48, preferably of the rotary type, having multiple period of time length setting positions * * *." '096 patent, col. 4, line 67 – col. 5, line 6. In particular, the patent explains that "start switch 46 and selector knob 48 are mounted to the housing 20 and are accessible at the exterior 24 thereof and are in operable communication with the electrical timing circuit 44 for controlling the initiation of generation of beam of laser light B and the length of the period of time that the beam of laser light B is generated, such as from ten to one hundred seconds. More particularly, the push button start switch 46 is mounted to the top 40 of the back base 40 and the rotary selector knob 48 is mounted to the upper front surface 38 of the front cover 38." '096 patent, col. 5, lines 6-16.

Additionally, the patent explains that "controlling means 30 * * * may further include a lock mechanism 50 mounted to the housing 20 and a key 50A insertable in the lock mechanism 50 for actuating the lock mechanism 50 between first and second positions. In the first position of the key 50A shown in solid line form in FIG. 2, the lock mechanism 50 permits the start switch 46 to be activated to the on (or closed) position whereas in the second position of the key 50A shown in dashed line form in FIG. 2, the lock mechanism 50 prevents the start switch 46 from being activated to the on position." '096 patent, col. 5, lines 17-26.

Other portions of the disclosure will be addressed below in conjunction with particular disputed claim terms.

44

**B.    Prosecution History**

**1.    Original Application**

The original application was filed with claims 1-20, providing as follows:

1. A hand-held laser light generator device for use in medical therapy, said device comprising:

(a) a wand defining an interior cavity and capable of being retained in a hand of a user;

(b) means for generating a beam of laser light mounted in said interior cavity of said wand and therewith being freely movable so as to enable the user to direct said beam of laser light onto a desired location;

(c) an optical arrangement mounted in said interior cavity of said wand for receiving the generated beam of laser light from said generating means and for transforming the generated beam of laser light into a line of laser light;

(d) a housing defining an interior chamber and having an exterior;

(e) means for supplying electrical power to said generating means being disposed in said interior chamber of said housing;

(f) means for electrically interconnecting said laser beam generating means and said electrical power supplying means; and

(g) means for controlling a period of time said beam of laser light is generated.

2. The device of claim 1 wherein said wand is a substantially elongated hollow tube.

3. The device of claim 1 wherein said generating means is a semiconductor diode laser using less than one watt of power.

4. The device of claim 1 wherein the generated said beam of light is in the visible/UV energy spectrum and has a wavelength of about 635 nm and a red color.

5. The device of claim 1 wherein said optical arrangement includes:

a collimating lens; and

a line generating prism, said collimating lens and line generating prism being disposed in a serial relation to said generating means.

6. The device of claim 1 wherein said electrical power supplying means is a battery.

45